## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

```
--------------------------------------------------------x
                                            :    Case No.
MANHATTAN VENTURE                           :
HOLDINGS LLC,                               :
                                            :    COMPLAINT
                            Plaintiff,      :
                                            :
        -against-                           :
                                            :
G SQUARED ASCEND I INC.,                    :    Jury Trial Demanded
                                            :
                            Defendants.     :
                                            :
--------------------------------------------------------x
```

Plaintiff Manhattan Venture Holdings LLC ("MVH," "Plaintiff," or "Manhattan Venture Partners"), by and through its attorneys, Carmel, Milazzo & Feil LLP, alleges for its Complaint against Defendant G Squared Ascend I Inc. ("G Squared" or "Defendant") as follows:

## NATURE OF THE ACTION

1.     This is an action arising from Defendant's willful infringement of Plaintiff's trademark. Plaintiff (together with its affiliates) is in the business of providing investment advisory and brokerage services to various funds. One of the signature lines of Plaintiff's business is the design and implementation of strategies to invest in late-stage venture-backed companies through stock purchased privately from existing shareholders. Such transactions are known as secondary purchases, to distinguish them from primary purchases, which entails the purchase of newly issued securities offered by a corporate issuer. Plaintiff is the owner of the federally registered trademark "SECONDARY AS A SERVICE®", which Plaintiff has used to advertise and promote Plaintiff's business and brand (the "MVP Brand").

2.      Incredibly, G Squared, whose underlying principals and affiliates are direct competitors of Plaintiff, in a blatant attempt to trade on the goodwill associated with Plaintiff's trademark and MVP Brand, used the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A-SERVICE" describing Defendant's services relating to the design and implementation of secondary offerings strategies.

3.      Defendants went as far as mendaciously claiming the ownership of such infringing marks in the offering materials for Defendant's initial public offering.

4.      UBS Securities LLC ("UBS") acted as the underwriter in connection with said offering, and, on behalf of G Squared, used materials with G Squared's infringing mark to advertise and solicit UBS' customers and the general public to purchase G Squared's securities. As alleged below, G Squared's use of its marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A-SERVICE" infringed upon Plaintiff's trademark in violation of federal and state law.

5.      Despite receiving notice that G Squared's marks infringed on Plaintiff's trademark, Defendant continues to use the infringing "SECONDARIES-AS-A-SERVICE" mark.

6.      Based upon Defendant's unlawful conduct as alleged below, Plaintiff asserts claims for federal trademark infringement, unfair competition, and false endorsement and association under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), violation of the Illinois Uniform Deceptive Trade Practices Act; violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; and unfair competition under Illinois common law, and is entitled to both monetary damages and injunctive relief to enjoin Defendants' continued infringement of Plaintiff's trademark.

## THE PARTIES

7.     Plaintiff Manhattan Venture Holdings LLC ("Plaintiff", "MVH" or "Manhattan Venture Partners") is a limited liability company organized and existing pursuant to the laws of the State of Delaware, with its principal place of business located at 152 Madison Avenue, 7th Floor, New York, New York.

8.     Upon information and belief, Defendant G Squared Ascend I Inc. ("G Squared" or "Defendant") is a corporation organized and existing pursuant to the laws of the Cayman Islands, with its principal place of business located at 205 N. Michigan Avenue, Suite 3770, Chicago, Illinois.

## JURISDICTION AND VENUE

9.     This Court has subject matter over this action pursuant to 28 U.S.C. §§ 1331 and 1338 in that Plaintiff's claims are predicated upon the Lanham Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. §§ 1051, *et seq*.

10.     In addition, this is an action in which the Plaintiff and Defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00, with subject matter jurisdiction being conferred on this Court under 28 U.S.C. § 1332.

11.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from the same nucleus of operative facts.

12.      This Court has personal jurisdiction over Defendant because Defendant is in the State of Illinois and in this judicial district.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTS COMMON TO ALL CLAIMS

**Background**

14.    Plaintiff is a holding company that owns the intellectual property of and controls a group of operating entities doing business as Manhattan Venture Partners. Plaintiff provides investment advisory and brokerage services to various businesses including funds. One of the signature lines of Plaintiff's business is the design and implementation of investment strategies to invest in late-stage venture-backed companies through stock purchased privately from existing shareholders, *i.e.*, structuring and conducting the secondary market offerings. These securities purchased on the secondary market are then owned and held by the funds until there is an initial public offering of such stock, or an acquisition or other liquidation event, when such stock can be sold by the funds. Additionally, Manhattan Venture Partners' team structures programmatic liquidity solutions in collaboration with issuers of securities and otherwise assists issuers to avoid premature initial public offerings or acquisitions.

15.    Upon information and belief, G Squared engages in the same or substantially similar business, and is a direct competitor of Manhattan Partner Ventures.

**Plaintiff Registers the Trademark SECONDARY AS A SERVICE**

16.    Given the unique nature of the equity capital investment services and investment products provided by Manhattan Partner Ventures, Manhattan Venture Partners coined the phrase "SECONDARY AS A SERVICE®", to create a strong brand identity in the marketplace. Plaintiffs began using the mark SECONDARY AS A SERVICE® on its website and in advertisements of its services in July 2015.

17.    In April 2016, Plaintiff applied to the United States Patent and Trademark Office ("USPTO") to grant it exclusive ownership of the federally registered word mark SECONDARY

AS A SERVICE® for a variety of capital market investment and financial investment brokerage services performed by Manhattan Venture Partners. The application was granted by the USPTO, and Plaintiff's word mark SECONDARY AS A SERVICE® was registered on April 11, 2017 (U.S. Trademark Registration No. 5,179,543). A copy of the certificate of registration is annexed hereto as Exhibit A.

18.     The federal registration granted Plaintiff with the exclusive right to use the phrase SECONDARY AS A SERVICE® in connection with the following services:

> CLASS 36: Capital investment; Capital investment consulting; Capital investment services; Equity capital investment; Fund investment consultation; Funds investment; Providing venture capital, development capital, private equity, and investment funding; Venture capital advisory services; Venture capital financing; Venture capital fund management; Venture capital funding services to emerging and start-up companies; Venture capital services, namely, providing financing to emerging and start-up companies; Financial investment brokerage services, namely, secondary stock sale services and private stock sale services performed for others; Financial consulting in the field of company liquidity programs, namely, brokering private tender offer and private liquidity transactions for others.

19.     MVH and its subsidiaries and affiliates have been using the SECONDARY AS A SERVICE® trademark (the "Trademark") in the United States for more than five years, regularly communicating it to its customers and prominently and consistently featuring it among its lines of services.

20.     As a result of Plaintiff's continuous use of the inherently distinctive SECONDARY AS A SERVICE® trademark and the commercial success of its investment services under this mark, Plaintiff has achieved substantial goodwill in the Trademark. The financial industry, and more specifically the private equity investment community, has come to favorably know, recognize and identify such services bearing the Trademark as services of Plaintiff.

21.     The trademark has come to represent the valuable goodwill and reputation of Plaintiff as a provider of investment services. As a result, the financial industry, and more specifically the private investment community, has come to know that investment services marketed and/or provided under the Trademark are exclusively associated with Plaintiff.

22.     Further, Plaintiff owns a domain name www.secondariesasaservice.com that redirects Manhattan Venture Partners' clients and prospective clients to its main website.

23.     During this time, the Trademark remained uncontested.

24.     The Trademark has become associated with Manhattan Venture Partners and the MVP Brand, and has become one of the most successful and renowned brands of Manhattan Venture Partners.

**Defendants' Infringement of the Trademark**

25.     In or about early February 2021, Plaintiff learned that Defendants were infringing on the Trademark.

26.     Specifically, Defendants violated Plaintiff's rights in the Trademark in connection with the promotion of G Squared's business in an initial underwritten public offering of G Squared's securities. The registration statement and the preliminary prospectus associated with such offering were filed with the United States Securities and Exchange Commission (the "SEC") on January 28, 2021 (the "Registration Statement") and became effective on February 4, 2021. This offer of securities was underwritten by UBS. A copy of the relevant portion of the Registration Statement on Form S-1/A is annexed hereto as Exhibit B.

27.     In its preliminary prospectus filed with the Registration Statement, G Squared used the phrases "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" as marks in the description and designation of its advertised signature strategies and lines of

businesses in connection with strategic management of portfolio funds by G Squared. For instance,

the prospectus provides as follows:

> Secondary Direct Investments: The G Squared team works alongside portfolio company C-suites and board members to create ongoing liquidity programs as the company's Right of First Refusal (RoFR) partner. G Squared refers to this investment strategy as their proprietary SaaS; **Secondaries-as-a-Service,** G Squared has deployed this **Secondaries-as-a-Service** strategy into a majority of their positions across their funds. This unique strategy enables strong rapport with portfolio company management teams and fosters longstanding relationships that persist well into the typical portfolio company's public market debut. Our sponsor's **Secondaries-as-a Service** provides portfolio company management teams and boards with (i) the ongoing absorption of secondary transactions identified by management that relieves the pressure of today's elongated private company life cycle, (ii) cap table / valuation management advisory, (iii) the enablement of employee options and shareholder financing programs and (iv) the creation of liquidity for other managers invested who hold shares in a vehicle that have exhausted the related fund's life. This contributes to the greater than 70% of shares in current active funds sourced through secondary transactions. Historically, this activity has supported portfolio companies to stay private longer. We view the G Squared Ascend strategy as an "Exit-as-a-Service" enhancement to our sponsor's core **Secondaries-as-a-Service** expertise. This strategy is being deployed as an increasing number of our portfolio companies appear ripe for public markets. G Squared views this overall **Secondaries-as-a-Service** approach as an important core competency of the organization that should serve to enhance our Company's likelihood of completing a successful merger. Additionally, our sponsor's experience in structuring transactions in the private market should translate to flexibility around reaching a successful deal…. (Emphases added)

> Our distinctive **Secondaries as a Service** model builds long-lasting rapport with company management teams. Core fund positions are typically built over dozens of transactions, while assisting companies with the management of their cap tables. (Emphases added)

28.     To trade on the goodwill associated with the Trademark and the MVP Brand, G

Squared prominently used the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES

AS A SERVICE", which merely changes the word "secondary" of the Trademark to its plural form, and is essentially identical to "SECONDARY AS A SERVICE" trademark.

29.     The marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" were used in association with services connected with "provid[ing] growth capital to companies and also satisfy[ing] the liquidity needs of early-stage investors and employees seeking to monetize or partially monetize their shares in these highly regarded growth-stage businesses," *i.e.*, services identical to Plaintiff's services.

30.     Upon information and belief, UBS marketed G Squared's securities to UBS's customers and the public using the infringing mark through the Prospectus and other marketing materials in private and public offerings of G Squared's securities.

31.     G Squared's use of the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" in the Prospectus creates the false impression that G Squared's goods and services originate from G Squared, not from Plaintiff, that the marks used are "proprietary" marks of G Squared, or that the marks in question are somehow connected or associated with Plaintiff's services and financial products, so as to deceive customers or to cause confusion or mistake as to the origin or affiliation of the actual originator of goods and services.

32.     The attempted association of the Trademark with G Squared's goods and services is likely to blur the distinctive character and tarnish the reputation of Plaintiff and the MVP Brand.

33.     On February 8, 2021, Plaintiffs notified G Squared and UBS that their use of the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" infringed upon the Trademark, and demanded that they immediately cease and desist from using same. Despite the foregoing, G Squared has refused to cease and desist from using the mark "SECONDARIES-AS-A-SERVICE".

34.    Not only has G Squared failed to cease and desist from the illegal use of Plaintiff's trademark, G Squared apparently proceeded with the closing of G Squared public and private offerings using materials that prominently featured said infringing marks, ignoring Plaintiff's cease and desist letter received by Defendants on February 8, 2021.

35.    On February 8, 2021, approximately at 5:17 pm, G Squared filed the Prospectus (which improperly included the infringing mark) under Rule 424(b)(4) with the SEC. Further, G Squared filed its Current Report on Form 8-K filed with the SEC on February 17, 2021, stating that "[o]n February 9, 2021, G Squared Ascend I Inc. (the "Company") consummated an initial public offering… together with certain of the proceeds from the Private Placement, $345,000,000…"

36.    Based upon the foregoing, Defendant's infringement was willful and in bad faith.

**Plaintiff Has Suffered Significant Harm**

37.    G Squared's unauthorized use of the Trademark has directly caused Plaintiff harm in the loss of exclusive rights to use and control the Trademark.

38.    Use of an identical or confusingly similar mark within the same investment community is likely to cause confusion.

39.    G Squared's unauthorized use has also caused Plaintiff harm in the form of confusion among consumers as to the origin and authenticity of Plaintiff's services and investment products and will cause additional irreparable harm in the form of usurpation of future business opportunities.

40.    Upon information and belief, Defendant's use of the Trademark has impaired the ability of business customers to identify accurately the source of Manhattan Venture Partners' business. Customers familiar with Plaintiff's services would likely assume incorrectly that the services provided by Defendant originated with Plaintiff, that Plaintiff is responsible for services

provided by Defendant, that there is some type of affiliation, connection, or association among the parties, or that Plaintiff has sponsored, endorsed, or approved of Defendant's services.

41.    Defendant's use of the infringing marks through advertisements and solicitations made through public and private offerings improperly trade off the goodwill Plaintiff has established in the SECONDARY AS A SERVICE® mark including the use of Plaintiff's goodwill to attract investors who are interested in secondary markets in private equity.

42.    Defendant, by its acts complained of herein, has infringed Plaintiff's trade name, trademark, and service mark rights in and to the Trademark; diluted the unique commercial impression of MVP Brand; unfairly competed with Plaintiff in the marketplace, and otherwise improperly used the reputation and goodwill of Plaintiff to promote their competing services which do not originate from, and which are not affiliated, connected or associated with, or sponsored, endorsed or approved by, Plaintiff.

43.    As a result of Defendant's conduct, Plaintiff has and will continue to suffer irreparable harm, for which Plaintiff has no adequate remedy at law.

### FIRST CLAIM FOR RELIEF
(Federal Trademark Infringement-15 U.S.C. § 1114)

44.    Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

45.    Plaintiff registration of the Trademark SECONDARY AS A SERVICE® on the principal register of the USPTO constitutes *prima facie* evidence of the validity of the Trademark, and proof of Plaintiff's ownership and exclusive right to use the Trademark in connection with its services.

46.    The registration also provides G Squared with notice of Plaintiff's exclusive rights to the Trademark.

47.     The Trademark has acquired substantial goodwill which has now been damaged by Defendants' use of the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE".

48.     G Squared used the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" in commerce by using the same in connection with the description of G Squared's services and strategies substantially similar to Plaintiff's financial advisory services and products and the solicitations for the purchase of securities in G Squared's initial public offering and private offering.

49.     Defendant used the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE" with the knowledge that the same infringed upon the Trademark.

50.     G Squared's aforementioned conduct created the false and misleading impression that Defendant is sanctioned or authorized by Plaintiff to use the Trademark to advertise, promote, solicit, and sell its securities, services, and/or investment-related products.

51.     G Squared engaged in the aforementioned conduct with the intent to confuse and mislead the public into believing that G Squared, and the services and products it advertised are affiliated with Plaintiff, or that G Squared is the true source of the Trademark, when it is not.

52.     G Squared's use of the Trademark is, and at all times was, without the consent of Plaintiff.

53.     G Squared's use of the Trademark has resulted in G Squared unfairly realizing benefits from Plaintiff's advertisement and promotion of the Trademark, and unjustly exploiting and usurping Plaintiffs' exclusive right to the Trademark.

54. By reason of the foregoing, G Squared is liable to Plaintiff for: (a) an amount representing three (3) times the amount of damages suffered by Plaintiff or Defendant's illicit profits; and (b) Plaintiff's reasonable attorneys' fees.

55. Additionally, Plaintiff is entitled to a preliminary and permanent injunction restraining and enjoining G Squared from continuing to infringe upon the Trademark.

## SECOND CLAIM FOR RELIEF
### (Federal Unfair Competition – 15 U.S.C. § 1125)

56. Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

57. G Squared's actions and conduct as alleged above constitute use in commerce of a word, term, or device and false designation of origin that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of G Squared with Manhattan Partner Ventures, or as to the origin, sponsorship or approval of G Squared's goods and services in violation of 15 U.S.C. 1125(a).

58. By reason of the foregoing, G Squared is liable to Plaintiff for: (a) an amount representing three (3) times the amount of damages suffered by Plaintiff or G Squared's illicit profits; and (b) Plaintiff's reasonable attorneys' fees.

59. Additionally, G Squared has caused irreparable harm, damage, and injury to Plaintiff. Accordingly, Plaintiff is entitled to a preliminary and permanent injunction restraining and enjoining G Squared from continuing to infringe upon the Trademark.

## THIRD CLAIM FOR RELIEF
### (Violation of Illinois Uniform Deceptive Trade Practices Act)

60. Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

61.     As alleged above, through Plaintiff's use and advertising of the Trademark, the Trademark has become associated with Manhattan Venture Partners.

62.     Plaintiff hereby alleges a deceptive trade practice violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §510/1, *et seq.*

63.     The Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §510/1, *et seq.*, provides that a person engages in deceptive trade practices when, *inter alia*, he "passes off goods or services as those of another;...causes likelihood of confusion or of misunderstanding as to affiliation, connection or association with or certification by another;... [or] represents that goods or services have sponsorship, approval, characteristics...that they do not have..." regardless of whether or not there is "competition between the parties or actual confusion or misunderstanding." 815 ILCS §510/2.

64.     Defendant's unauthorized use of the marks identical to the Trademark, or approximations or simulations thereof, trades on the business reputation and goodwill of Plaintiff with the intention of deceiving the public into believing that Defendant is affiliated, connected or associated with Plaintiff in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS §510/1-7.

65.     Plaintiff has been and is being damaged by such violation and has no adequate remedy at law. Defendant's unlawful and willful conduct will continue to damage Plaintiff unless enjoined by this Court.

66.     Based on Defendant's previous and continuing knowledge of Plaintiffs federally-registered mark and receipt of Plaintiff's cease and desist letter, and continued activities, Defendant's violation of the Illinois Uniform Deceptive Trade Practices Act is willful.

## FOURTH CLAIM FOR RELIEF

(Violation of Illinois Consumer Fraud and Deceptive Business Practices Act)

67.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

68.     Plaintiff hereby alleges a deceptive trade practice violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/1, *et seq*.

69.     Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/1, *et seq.*, makes "the use or employment of any deception[,] fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact,... or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act'...in the conduct of any trade or commerce" unlawful, regardless of whether "any person has in fact been misled, deceived or damaged thereby." 815 ILCS §505/2.

70.     Defendant's continuing unauthorized use of the marks identical to the Trademark, or approximations or simulations thereof, so as to mislead and deceive the public by suggesting an association, connection, or affiliation of Defendant with Plaintiff is an unfair method of competition and a deceptive act or practice in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §505/1-12.

71.     Plaintiff has been damaged by such violation and has no adequate remedy at law. Defendant's unlawful conduct will continue to damage Plaintiff unless enjoined by this Court.

72.     Based on Defendant's previous and continuing knowledge of Plaintiffs federally-registered mark and receipt of Plaintiff's cease and desist letter, and continued activities, Defendant's violation of the Illinois Uniform Deceptive Trade Practices Act is willful.

## FIFTH CLAIM FOR RELIEF
### (Common Law Trademark Infringement)

73.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

74.     G Squared's conduct as alleged above constitutes an infringement of Plaintiff's common law trademark rights under Illinois law.

75.     As a result of the foregoing, Plaintiff has suffered irreparable damage and harm, and is entitled to a judgment for monetary damages in an amount to be determined at trial, together with preliminary and permanent injunctive relief, enjoining G Squared from using the Trademark (and the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE") in any manner.

## SIXTH CLAIM FOR RELIEF
### (Common Law Unfair Competition)

76.     Plaintiff repeats and realleges each and every allegation contained in the above paragraphs as if set forth fully herein.

77.     As alleged above, G Squared's conduct and use of the phrases "SECONDARIES-AS-A-SERVICE" and SECONDARIES AS A SERVICE" in the Registration statement and prospectuses and in advertising G Squared's services and products are likely to cause confusion with the Trademark as to the source thereof, and as to whether there is an affiliated with Plaintiff.

78.     G Squared's unauthorized use and infringement of the Trademark has resulted in an unfair benefit to G Squared from Plaintiff's advertising and promotion of the Trademark, and from the goodwill associated therewith.

79.     As a result of the foregoing, Plaintiff has suffered irreparable damages and injury. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief enjoining G

Squared from using the Trademark (or the marks "SECONDARIES-AS-A-SERVICE" and "SECONDARIES AS A SERVICE") in any manner.

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)      On the First Claim for Relief, in favor of Plaintiff, and against Defendant (i) in an amount representing three (3) times the amount of damages suffered by Plaintiff or Defendants' illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting a preliminary and permanent injunction restraining and enjoining G Squared from continuing to infringe upon the Trademark and damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(b)      On the Second Claim for Relief, in favor of Plaintiff, and against Defendant (i) in an amount representing three (3) times the amount of damages suffered by Plaintiff or Defendants' illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting preliminary and permanent injunction restraining and enjoining G Squared, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from continuing to infringe upon the Trademark and damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(c)      On the Third Claim for Relief, in favor of Plaintiff, and against Defendant, pursuant to 815 ILCS 510/2 (i) in an amount representing damages suffered by Plaintiff or Defendants' illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting preliminary and permanent injunction restraining and enjoining G Squared, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from continuing to infringe upon the Trademark and

damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(d)     On the Fourth Claim for Relief, in favor of Plaintiff, and against Defendant (i) in an amount representing the amount of damages suffered by Plaintiff or Defendants' illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting preliminary and permanent injunction restraining and enjoining G Squared, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from continuing to infringe upon the Trademark and damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(e)     On the Fifth Claim for Relief, in favor of Plaintiff, and against Defendant (i) in an amount representing three (3) times the amount of damages suffered by Plaintiff or Defendant's illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting preliminary and permanent injunction restraining and enjoining G Squared, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them from continuing to infringe upon the Trademark and damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(f)     On the Sixth Claim for Relief, in favor of Plaintiff, and against Defendant (i) in an amount representing three (3) times the amount of damages suffered by Plaintiff or Defendant's illicit profits; and (ii) Plaintiff's reasonable attorneys' fees; and (b) granting preliminary and permanent injunction restraining and enjoining G Squared, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert

or in participation with any of them from continuing to infringe upon the Trademark and damaging Plaintiff's goodwill or otherwise competing unfairly with Plaintiff or any of their authorized licensees in any manner;

(g)     Pursuant to 15 U.S.C. § 1116, directing Defendant to account to Plaintiff for the profits obtained through the unlawful activities alleged herein and unjust enrichment obtained through the unauthorized use of Plaintiff's Trademark;

(h)     Awarding Plaintiff punitive damages pursuant to Illinois common law on account of Defendant's gross, wanton, willful, and malicious conduct;

(i)     For its costs and disbursement, including its reasonable attorneys' fees;

(j)     For such other and further relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: Skokie, Illinois
      March 4, 2021

                    LAW OFFICE OF JOHN F. STIMSON LTD,

                    By: */s/ John F. Stimson*
                          John F. Stimson, Esq.
                    9933 Lawlor Avenue, #312
                    Skokie, Illinois 60077
                    (847) 676-1000 (tel.)
                    (877) 877-0886 (fax)
                    john@stimson-law.com

                    CARMEL, MILAZZO & FEIL LLP
                    Christopher P. Milazzo
                    55 West 39th Street, 18th Floor
                    New York, New York 10018
                    (212) 658-0458 (tel.)
                    (646) 838-1314 (fax)
                    cmilazzo@cmfllp.com

                    *Attorneys for Plaintiff*

**EXHIBIT A**

# United States of America

## United States Patent and Trademark Office

# secondary as a service

**Reg. No. 5,179,543**

**Registered Apr. 11, 2017**

**Int. Cl.: 36**

**Service Mark**

**Principal Register**

Manhattan Venture Holdings (DELAWARE LIMITED LIABILITY COMPANY)
14th Fl
5 Penn Plaza
New York, NY 10001

CLASS 36: Capital investment; Capital investment consulting; Capital investment services; Equity capital investment; Fund investment consultation; Funds investment; Providing venture capital, development capital, private equity and investment funding; Venture capital advisory services; Venture capital financing; Venture capital fund management; Venture capital funding services to emerging and start-up companies; Venture capital services, namely, providing financing to emerging and start-up companies; Financial investment brokerage services, namely, secondary stock sale services and private stock sale services performed for others; Financial consulting in the field of company liquidity programs, namely, brokering private tender offer and private liquidity transactions for others

FIRST USE 7-14-2015; IN COMMERCE 7-14-2015

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

SER. NO. 87-011,058, FILED 04-22-2016
VALERIYA SHERMAN, EXAMINING ATTORNEY



Director of the United States
Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

**EXHIBIT B**

short window. As VC backed companies have continued to stay private longer, the number of businesses with a valuation of over $1 billion has dramatically accelerated. The typical private company lifecycle has elongated from just a few years from idea to IPO to ~14 years in 2018, according to the Kauffman Fellows. According to CB Insights, as of January 2021, there were 518 private company Unicorns with a cumulative valuation of $1.6 trillion.

Against this backdrop, G Squared built a business that provides growth capital to companies and also satisfies the liquidity needs of early-stage investors and employees seeking to monetize or partially monetize their shares in these highly regarded growth-stage businesses. G Squared's status as an RIA, allows it to purchase both primary and secondary direct shares. Many traditional VC firms operate under the Venture Capital Exemption Act which restricts their weighting of capital allocation into secondary transactions. These traditional VCs must deploy over 80% of their funds directly into primary rounds. G Squared's flexibility in building positions in companies has created a structuring expertise that includes a variety of securities. We believe this proven ability to tailor liquidity solutions to the specific needs of a target company will be an attractive element of our value proposition to potential business combination targets. The areas of historical investment focus for G Squared include the following:

➤ Secondary Direct Investments: The G Squared team works alongside portfolio company C-suites and board members to create ongoing liquidity programs as the company's Right of First Refusal (RoFR) partner. G Squared refers to this investment strategy as their proprietary SaaS; Secondaries-as-a-Service. G Squared has deployed this Secondaries-as-a-Service strategy into a majority of their positions across their funds. This unique strategy enables strong rapport with portfolio company management teams and fosters longstanding relationships that persist well into the typical portfolio company's public market debut. Our sponsor's Secondaries-as-a Service provides portfolio company management teams and boards with (i) the ongoing absorption of secondary transactions identified by management that relieves the pressure of today's elongated private company life cycle, (ii) cap table / valuation management advisory, (iii) the enablement of employee options and shareholder financing programs and (iv) the creation of liquidity for other managers invested who hold shares in a vehicle that have exhausted the related fund's life. This contributes to the greater than 70% of shares in current active funds sourced through secondary transactions. Historically, this activity has supported portfolio companies to stay private longer. We view the G Squared Ascend strategy as an "Exit-as-a-Service" enhancement to our sponsor's core Secondaries-as-a-Service expertise. This strategy is being deployed as an increasing number of our portfolio companies appear ripe for public markets. G Squared views this overall Secondaries-as-a-Service approach as an important core competency of the organization that should serve to enhance our Company's likelihood of completing a successful merger. Additionally, our sponsor's experience in structuring transactions in the private market should translate to flexibility around reaching a successful deal.

➤ Primary Direct Investments: Primary direct investments will typically consist of equity (preferred or common stock) or convertible debt and can include multiple structuring mechanisms to enhance return profile or protect against investment losses.

➤ Employee Tenders: G Squared has led a substantial number of employee tenders for portfolio companies in previous flagship funds that often relieve employee retention concerns by providing needed liquidity. This expertise may be of value in an acquisition that includes a secondary component for the target business.

Our sponsor has developed an extensive global network of venture GP peers and growth-stage management teams. Further, G Squared has created a niche in the growth venture capital ecosystem by becoming a trusted liquidity solution provider to:

➤

## OUR MISSION AND CRITERIA

G Squared Ascend will build on our sponsor's vision to provide current and future investors greater access to leading growth companies through a systemic strategy we call "ASCEND". The ASCEND strategy will provide the growth ecosystem an "Exit-as-a-Service" capability to augment G Squared's existing Secondaries-as-a-Service proficiency. ASCEND will further provide growth companies and their investors a favorable alternative to the conventional IPO and M&A exit paths. G Squared's ASCEND strategy will provide the Company with an ideal partner to facilitate a public listing.

The combination of our sponsor and our structure provides the following benefits to our partner companies and investors:

Alignment of Interests—The Company serves as a natural extension of the service we provide our portfolio companies as a transitional capital provider. Further, our sponsor investment will sit within private funds managed by G Squared, ensuring that the substantial majority of sponsor economics earned will be shared among our fund investors.

Structure—G Squared has developed expertise in innovative structuring of private market deal flow in order to facilitate successful, high-returning transactions. This activity includes negotiating RoFR rights, converts, virtual options, employee tenders, forward purchase agreements, IPO ratchets and IPO options.

Capital Raising—G Squared has deployed over $2B since 2011 across several venture funds, managed accounts and co-investments. Our business has over 200 LPs across 26 countries and six continents. Certain members of our management team hold two decades of public equity market experience.

Exit Strategy—An essential component of our investment thesis. Our research team carefully evaluates public market comparable valuation across numerous key metrics and weighs investor psychology in determining ultimate success for our investments as they transition to public markets. A long-tailed growth opportunity that has already achieved meaningful scale and profitability metrics are key underpinnings.

Network—G Squared's transaction-based approach to constructing positions is built on the establishment of comprehensive working relationships with both peer venture capital funds and the management teams of portfolio companies. Our distinctive Secondaries as a Service model builds long-lasting rapport with company management teams. Core fund positions are typically built over dozens of transactions, while assisting companies with the management of their cap tables. These numerous touch points forge important associations while extending our network reach across the growth stage ecosystem.

Domain Expertise—G Squared focuses on certain transformative tech-centric megatrends such as Software-as-a-Service, Online Marketplaces, Mobility 2.0, FinTech, New Age Media, and Sustainability. There is a multi-year growth profile associated with leading businesses in these categories. This core competency enhances our ability to identify a growing business that will resonate well with public market tech investors.

**Proposed business**

Fellows. According to CB Insights, as of January 2021, there were 518 private company Unicorns with a cumulative valuation of $1.6 trillion.

Against this backdrop, G Squared built a business that provides growth capital to companies and also satisfies the liquidity needs of early-stage investors and employees seeking to monetize or partially monetize their shares in these highly regarded growth-stage businesses. G Squared's status as an RIA, allows it to purchase both primary and secondary direct shares. Many traditional VC firms operate under the Venture Capital Exemption Act which restricts their weighting of capital allocation into secondary transactions. These traditional VCs must deploy over 80% of their funds directly into primary rounds. G Squared's flexibility in building positions in companies has created a structuring expertise that includes a variety of securities. We believe this proven ability to tailor liquidity solutions to the specific needs of a target company will be an attractive element of our value proposition to potential business combination targets. The areas of historical investment focus for G Squared include the following:

➤ Secondary Direct Investments: The G Squared team works alongside portfolio company C-suites and board members to create ongoing liquidity programs as the company's Right of First Refusal (RoFR) partner. G Squared refers to this investment strategy as their proprietary SaaS; Secondaries-as-a-Service. G Squared has deployed this Secondaries-as-a-Service strategy into a majority of their positions across their funds. This unique strategy enables strong rapport with portfolio company management teams and fosters longstanding relationships that persist well into the typical portfolio company's public market debut. Our sponsor's Secondaries-as-a Service provides portfolio company management teams and boards with (i) the ongoing absorption of secondary transactions identified by management that relieves the pressure of today's elongated private company life cycle, (ii) cap table / valuation management advisory, (iii) the enablement of employee options and shareholder financing programs and (iv) the creation of liquidity for other managers invested who hold shares in a vehicle that have exhausted the related fund's life. Historically, this activity has supported portfolio companies to stay private longer. We view the G Squared Ascend strategy as an "Exit-as-a-Service" enhancement to our sponsor's core Secondaries-as-a-Service expertise. This strategy is being deployed as an increasing number of our portfolio companies appear ripe for public markets. G Squared views this overall Secondaries-as-a-Service approach as an important core competency of the organization that should serve to enhance our Company's likelihood of completing a successful merger. Additionally, our sponsor's experience in structuring transactions in the private market should translate to flexibility around reaching a successful deal.

➤ Primary Direct Investments: Primary direct investments will typically consist of equity (preferred or common stock) or convertible debt and can include multiple structuring mechanisms to enhance return profile or protect against investment losses.

➤ Employee Tenders: G Squared has led a substantial number of employee tenders for portfolio companies in previous flagship funds that often relieve employee retention concerns by providing needed liquidity. This expertise may be of value in an acquisition that includes a secondary component for the target business.

Our sponsor has developed an extensive global network of venture GP peers and growth-stage management teams. Further, G Squared has created a niche in the growth venture capital ecosystem by becoming a trusted liquidity solution provider to:

➤ Portfolio Companies: Partnering with management teams and boards by providing growth capital in primary rounds, assisting with cap table management by purchasing secondary shares from willing sellers and supporting worker retention with coordinated and structured employee tender transactions.